IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

EXPO PROPERTIES, LLC, et al., :

    Plaintiffs, :

v. :

                      Civil Action No. GLR-14-688

EXPERIENT, INC, :

    Defendant. :

**MEMORANDUM OPINION**

THIS MATTER is before the Court on Defendant's, Experient, Inc. ("Experient"),[1] Motion for Partial Summary Judgment (ECF No. 54) and Plaintiffs', Expo Properties, LLC ("Expo Properties") and Merchants Properties, LLC ("Merchants Properties"), Motion for Partial Summary Judgment[2] (ECF No. 62). This case concerns a landlord-tenant dispute associated with the Galaxy Building, a large commercial property in Frederick, Maryland. Principally at issue are how the parties' lease agreement should be construed as a matter of law and whether the parties amended their lease agreement to make Experient responsible for paying the entire cost of all repairs.

Having reviewed the Motions and supporting documents, the Court finds no hearing necessary. See Local Rule 105.6 (D.Md. 2016). For the reasons outlined below, the Court will deny Expo

---

[1] The Court will also use "Experient" to refer to Experient's predecessors.

[2] The Court will refer to this Motion as "Expo Properties's Motion."

Properties's Motion and grant in part and deny without prejudice in part Experient's Motion.

## I.   BACKGROUND[3]

### A.   The Lease Agreement

On March 17, 1994, John Laughlin, the Galaxy Building's original owner, executed a Lease Agreement with Galaxy Registration, Inc. ("Galaxy"). Galaxy agreed to rent approximately 25,000 square-feet of office and warehouse space in the Galaxy Building (the "Leased Premises") for an initial term of five years.

The Lease Agreement assigns financial responsibility for repairs, maintenance, and capital improvements. Article 4D(2) provides that Galaxy "agrees to pay the costs and expenses paid or incurred by or on behalf of Landlord for managing, operating, maintaining and repairing the Leased Premises." (Def.'s Mot. for Partial Summ. J. Ex. 1A ["Lease Agreement"], at 4, ECF No. 54-2). Article 4D(3) then states that capital improvements shall be included in "Landlord expenses and charged to the Tenant as additional rent." (Id. at 5). Article 6C provides that Galaxy is responsible for paying all repair and maintenance costs associated with the "exterior and interior of the Leased Premises, together with all windows and glass, electrical,

_____

[3] Unless otherwise noted, the following facts are taken from the parties' briefings and exhibits, undisputed, and viewed in the light most favorable to the nonmoving party.

2

plumbing, heating, air conditioning and other mechanical equipment." (Id. at 8). Galaxy's exclusive financial responsibility for all repairs and maintenance, however, is subject to an exception. The final clause of Article 6C (the "Article 6 Cost-Sharing Provision") stipulates that landlord and tenant shall each pay fifty percent of the cost of a repair or replacement when it "(i) is not made necessary in whole or in part as a result of Tenant's negligence, (ii) is Five Thousand Dollars ($5,000.00) or more in amount, and (iii) has an actual economic life in excess of the term of the Lease then in effect." (Id.).

Article 8 governs structural repairs and maintenance. It provides that "Tenant shall be responsible to make all necessary repairs during the term of this Lease to the roof of the building to which the Leased Premises are a part and all necessary structural repairs to the exterior walls, foundations, sidewalks, parking lots, and driveways." (Id. at 11). Article 8 specifies that "Landlord is under no obligation to perform any repairs and/or maintenance with respect to the Leased Premises." (Id.). Nevertheless, Article 8's penultimate clause (the "Article 8 Cost-Sharing Provision") provides an exception to the tenant's sole financial responsibility for structural repairs and maintenance. Like the Article 6 Cost-Sharing Provision, the Article 8 Cost-Sharing Provision stipulates that landlord and

tenant shall each pay fifty percent of the cost if: "(i) the structural repair or maintenance is not made necessary in whole or in part as a result of Tenant's negligence, (ii) the cost of an item of structural repair or maintenance is Five Thousand Dollars ($5,000.00) or more, and (iii) the actual economic life of such structural repairs or maintenance is in excess of the term of the Lease then in effect."  (Id. at 11–12).

The Lease Agreement also addresses the condition in which the tenant must return the Leased Premises at the end of the term.  Article 6C makes Galaxy responsible for returning "the exterior and interior of the Leased Premises . . . in the same good order in which they are received."  (Id. at 8).  And, Article 24 provides that the tenant must "return the Leased Premises and all equipment and fixtures of Landlord therein to Landlord in as good condition as when Tenant originally took possession, ordinary wear . . . excepted."  (Id. at 22).

## B.   Lease Amendments, the May 1998 Letter, and the Estoppel Certificate

The parties amended the Lease Agreement on several occasions.  In the "Amendment to Lease" ("First Amendment") executed on April 21, 1997, Laughlin agreed to construct a two-story, 25,700 square-foot addition to the Leased Premises, which Galaxy would occupy beginning in January 1998.  (Id. Ex. 1B, ECF No. 54-2).  Following a change in Galaxy's ownership structure,

4

Expo Exchange, LLC ("Expo Exchange") became the tenant under the Lease Agreement in October 1997.   In the "Second Amendment to Lease Agreement," ("Second Amendment") executed on January 12, 1998, the parties agreed to increased rent to account for Galaxy[4] moving into the addition and adjusted the start date of the five-year lease to February 1, 1998.   (Id. Ex. 1C, ECF No. 54-2).

On May 1, 1998, Laughlin wrote a letter to Michael Goodwin, the President and Chief Executive Officer of Galaxy (the "May 1998 Letter").   (Id. Ex. 4, ECF No. 54-5).   The apparent purpose of the May 1998 Letter was to resolve what Laughlin perceived as confusion regarding who the Lease Agreement requires to pay for repairs, maintenance, and capital improvements.   Laughlin explained that "our lease makes it clear that all costs for repairs, maintenance, and capital improvements will be borne by Galaxy."   (Id.).   Laughlin went on to further emphasize this point, stating that "in all cases where we agree that work needs to be done, Galaxy pays the bill."   (Id.).   Laughlin did not address the Articles 6 and 8 Cost-Sharing Provisions in the May 1998 Letter.

In the "Third Amendment to Lease," ("Third Amendment") executed on March 29, 2002, Expo Exchange exercised its option

---

[4]  Though Expo Exchange became the tenant under the Lease Agreement in 1997, Galaxy's name remained on the Second Amendment.

to extend the lease for an additional five-year term commencing on February 1, 2003 and terminating on January 31, 2008. (Id. Ex. 1D, ECF No. 54-2). In the "Fourth Amendment to Lease Agreement," ("Fourth Amendment") executed on August 30, 2005, Expo Exchange agreed to rent 11,150 square-feet of space in the property adjacent to the Galaxy Building. (Id. Ex. 1E, ECF No. 54-2).

In October 2004, Laughlin transferred his interest in the Lease Agreement to Expo Properties, LLC ("Expo Properties"). Then, in 2006, Merchants Properties, with a loan from Mercantile Safe Deposit and Trust Company ("Mercantile"), acquired the Leased Premises when it acquired all membership interests in Expo Properties. In accordance with the obligation in Article 26 of the Lease Agreement, Expo Exchange executed an Estoppel Certificate on July 18, 2006. (Id. Ex. 5, ECF No. 54-6). In the Estoppel Certificate, Experient represents that it is the tenant under the Lease Agreement and it is not in default of any of its obligations. (Id.). The Estoppel Certificate also provides that the Lease Agreement had been amended by the First through Fourth Amendments and the May 1998 Letter. (Id.).

Paragraph 8 of the Estoppel Certificate addresses Expo Exchange's financial responsibility for repairs, maintenance, and capital improvements. It begins by reciting the first sentence of Article 8 of the Lease Agreement, which provides

6

that the tenant shall be responsible for all structural repairs and maintenance. (Id. at 3). Paragraph 8 then states that "[t]his provision and provisions of Article 4D(2) and 4D(3) are clarified in the May 1998 Letter." (Id.). Finally, Paragraph 8 provides that "Tenant acknowledges that all repairs to the Building and the Leased Premises of which the Building are a part are the responsibility of Tenant, including capital improvements." Like the May 1998 Letter, Paragraph 8 does not mention the Articles 6 and 8 Cost-Sharing Provisions. (Id.).

On November 14, 2011, Expo Properties and Experient, Expo Exchange's successor in interest, executed a "Fifth Amendment to Lease" ("Fifth Amendment") to extend the lease termination date to July 31, 2013. (Id. Ex. 1F ["Fifth Amendment"], ECF No. 54-2). The Fifth Amendment defines the "existing Lease" as the Lease Agreement plus the First through Fourth Amendments and the Estoppel Certificate.

C.   **Preparation for Lease Expiration**

In June 2012, approximately one year before the Lease Agreement was due to expire, Expo Properties requested that Experient provide inspection reports for the roof and the heating, ventilation, and air conditioning ("HVAC") systems. Experient responded in January 2013 with one-page summaries. On January 30, 2013, Harry Halpert, President of Expo Properties, wrote a letter to Mark Alspaw, Vice President of Real Estate for

7

Maritz Holding, Inc., Experient's parent company, explaining that the one-page summaries were insufficient. Halpert stated that Expo Properties fully expected Experient to promptly make the repairs recommended in the one-page summaries and that Expo Properties would send its own inspector to complete a survey of the entire Leased Premises. Halpert then added that if Expo Properties's inspector determined that any additional repairs or replacements were necessary, Experient would have to complete them, in their entirety, before the Lease Agreement expired.

Halpert also used his January 30, 2013 Letter as an opportunity to further clarify what he considered Experient's responsibilities for repairs and replacements under the Lease Agreement. Halpert asserts that the Fifth Amendment to the Lease Agreement expressly incorporated by reference the Estoppel Certificate and May 1998 Letter. As such, he contends, the Leased Premises "are to be surrendered by Experient to [Expo Properties] with all the necessary repairs and replacements having been made by Experient, and in the condition otherwise required under the Lease, on or before July 31, 2013." (Id. Ex. 8, at 2, ECF No. 54-9).

Expo Properties sent KCI Technologies, Inc. ("KCI") to inspect the Leased Premises on March 19, 2013. That inspection resulted in a Building Assessment Report dated May 30, 2013 ("KCI's Initial Report"). (Id. Ex. 9, ECF No. 54-10). KCI's

Initial Report includes three-and-a-half pages of recommended repairs and replacements estimated to cost approximately $1 million. (Id.).

Also on May 30, 2013, Douglas Hoffberger, the President of Keystone Realty, with whom Expo Properties had contracted to manage the Leased Premises, sent an email to Alspaw (the "Hoffberger Email"). (Id. Ex. 10, ECF No. 54-11). Hoffberger attached KCI's Initial Report and directed Experient to perform all the work that KCI identified before the end of the lease term. (Id.). Hoffberger also directed Experient to remove walls that did not reach the ceiling ("half-walls"), replace the carpeting that had been removed under the footprint of the half-walls, and remove and replace "[a]ll carpeting that is damaged or worn." (Id. at 2).

In early July 2013, Experient began to vacate the Leased Premises by moving its employees, furniture, fixtures, and equipment. Around this same time, Experient sent a letter to Expo Properties stating that Experient disagreed with numerous items in KCI's Initial Report. (Id. Ex. 17, ECF No. 54-18). Experient explained that "[s]everal items in [KCI's Initial] Report are 'should' or 'could' repairs, not deemed 'necessary.'" (Id. at 2). Experient also asserted that the May 1998 Letter did not modify the Lease and, as such, the Articles 6 and 8 Cost-Sharing Provisions were still operative. (Id.).

Furthermore, Experient listed all the repairs and replacements recommended in the Hoffberger Email and KCI's Initial Report and identified those which it would and would not perform. (Id. at 3–17). Experient agreed to remove all the half-walls it installed, but only "as a courtesy" to Expo Properties. (Alspaw Dep. 174:7–10, May 12, 2015, ECF No. 54-19). Experient did not agree to fill in with new carpet the voids under the half-walls, replace old HVAC units remaining from the original construction of the Galaxy Building, replace original thermostats with programmable thermostats, replace carpeting that was damaged or worn throughout the Leased Premises, or perform several types of roof repairs. (Def.'s Mot. for Partial Summ. J. Ex. 17, ECF No. 54-18).

Experient vacated the Leased Premises on or about the lease expiration date of July 31, 2013. Experient has made some, but not all, of the repairs and replacements identified in the Hoffberger Email and KCI's Initial Report.

**D.   Notice of Default**

KCI, at Expo Properties's request, re-inspected the premises on August 8, 2013 and prepared a Re-Inspection Report dated August 27, 2013 ("KCI's Re-Inspection Report"). (Id. Ex. 14, ECF No. 54-15). KCI's Re-Inspection Report identified all of the repairs and recommendations in KCI's Initial Report that Experient did not complete and also highlighted additional

repairs that KCI considered necessary in light of the re-inspection. (Id.).

On October 2, 2013, Expo Properties sent Experient a formal notice of default advising Experient that its "failure to properly maintain, repair, and restore" the Leased Premises violated Articles 6 and 8 of the Lease Agreement, the Estoppel Certificate, and the May 1998 Letter. (Id. at 1). Expo Properties then asserted that Experient was responsible for making all repairs specified in KCI's Initial and Re-Inspection Reports. (Id.). Expo Properties also contended that prior to vacating the Leased Premises, Experient "was required to remove certain interior walls" and replace the carpet "damaged by the addition and removal of such walls." (Id. at 2). Expo Properties attached a floor plan that identified all the floor-to-ceiling walls that it wanted removed and estimated that the cost to remove the walls and replace the carpet would be $240,504. (Id. at 2-4). Finally, Expo Properties concluded the letter by demanding that Experient cure the purported defaults by paying Expo Properties $1,145,669. (Id. at 2).

**E.   Procedural History**

Expo Properties initiated this suit on March 10, 2014, raising four claims: (1) breach of contract (Count I); (2) promissory estoppel (Count II); negligence (Count III); and (4) declaratory judgment (Count IV). (ECF No. 1). The Complaint

alleges that "Experient failed to perform its maintenance and repair obligations, and left the [Leased Premises] in poor condition and disrepair when it vacated." (Compl. ¶ 2, ECF No. 1). The Complaint specifies that Experient failed to remove certain interior walls, restore carpeting, and repair the roof, asphalt, sidewalk, HVAC units, and certain other structural areas. (Id. ¶¶ 21, 22).

Expo Properties filed a First Amended Complaint on May 13, 2014, increasing the amount of damages from $1,900,000 to $2,389,000. (ECF No. 17). The $2,389,000 figure includes $1,419,000 in holdover rent that Expo Properties calculated pursuant to Article 28 of the Lease Agreement. (Id.). On September 29, 2014, the Court issued a Letter Order dismissing Expo Properties's negligence claim. (ECF No. 37). Experient filed a Motion for Partial Summary Judgment on September 11, 2015. (ECF No. 54). Expo Properties filed a cross Motion for Partial Summary Judgment and Opposition to Experient's Motion on October 20, 2015. (ECF Nos. 62, 62-1). Experient then submitted a Response to Expo Properties's Motion and a Reply in support of its Motion on December 4, 2015. (ECF No. 65). Finally, Expo Properties filed a Reply in Support of its Motion for Partial Summary Judgment on January 8, 2016. (ECF No. 68). The Motions are ripe for disposition.

## II.   DISCUSSION

### A.   Standard of Review

#### 1.   Summary Judgment

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Once a motion for summary judgment is properly made and supported, the nonmovant has the burden of showing that a genuine dispute of material fact exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th

Cir. 2001)).   Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265.  A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248.

When the parties have filed cross-motions for summary judgment, the court must "review each motion separately on its own merits to 'determine whether either of the parties deserves judgment as a matter of law.'"  Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Philip Morris Inc. v. Harshbarger, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).   Moreover, "[w]hen considering each individual motion, the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion."  Id. (quoting Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996)).   This Court, however, must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial.  Drewitt v. Pratt, 999 F.2d 774, 778-79 (4th Cir. 1993). If the evidence presented by the nonmovant is merely colorable,

or is not significantly probative, summary judgment must be granted. Anderson, 477 U.S. at 249–50.

B.   **Analysis**

The parties move for summary judgment on Expo Properties's claim for declaratory judgment.   Expo Properties moves for a declaration that: (1) the Estoppel Certificate amended the Lease Agreement; and the Lease Agreement requires Experient to (2) pay the entire cost of all repairs to the Leased Premises, and (3) return the Leased Premises in the same good order and original condition in which Experient received them.   Experient moves for a declaration that: (1) the Estoppel Certificate did not amend the Lease Agreement; and the Lease Agreement does not require Experient to (2) remove floor-to-ceiling walls, (3) replace HVAC components that are performing within specifications simply due to age, (4) replace all carpeting throughout the entire Leased Premises, or (5) pay for any repairs to structural elements of the Leased Premises, like the roof, that Expo Properties did not make and charge to Experient as "additional rent" during the lease term.[5]   The Court will address these issues in turn.

_____

[5] Experient also seeks a declaration that Expo Properties is not entitled to hold-over rent as damages.   The Declaratory Judgment Act, 28 U.S.C. § 2201 (2012), grants federal district courts discretion to entertain declaratory judgment actions. See Wilton v. Seven Falls Co., 515 U.S. 277, 282 (1995). District courts have "discretion to entertain a declaratory judgment action if the relief sought (i) 'will serve a useful purpose in clarifying and settling the legal relations in issue'

1. **Expo Properties's Motion**

   a. **The Estoppel Certificate**

Expo Properties first asserts that the Estoppel Certificate amended the Lease Agreement by removing the Articles 6 and 8 Cost-Sharing Provisions. Experient responds that the Estoppel Certificate did not amend the Lease Agreement because there was neither mutual assent nor consideration, both of which are required to form a valid contract amendment. Expo Properties counters that a benefit provided to a third party can satisfy the consideration requirement. Expo Properties also asserts that the Estoppel Certificate amended the Lease Agreement because the Fifth Amendment expressly defines the Lease Agreement as including the Estoppel Certificate.

Under Maryland law,[6] a party to a contract does not have a right to unilaterally modify the contract. <u>Cambridge Techs.,</u>

---

and (ii) 'will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" <u>First Nationwide Mortg. Corp. v. FISI Madison, LLC</u>, 219 F.Supp.2d 669, 672 (D.Md. 2002) (quoting <u>Cont'l Cas. Co. v. Fuscardo</u>, 35 F.3d 963, 965 (4th Cir. 1994)). The Court finds that there would be no useful purpose at this point in the litigation in deciding whether Expo Properties is entitled to hold-over rent as damages because Experient has not been adjudged liable for breach of contract or promissory estoppel. The Court, therefore, will not address hold-over rent.
    [6] The Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1) (2012). (ECF No. 1). The Court, thus, must apply the substantive law of Maryland. <u>See</u> <u>Nationwide Mut. Ins. Co. v. Welker</u>, 792 F.Supp. 433, 437 (D.Md. 1992) (citing <u>Erie R.R. Co. v. Tompkins</u>, 304 U.S. 64, 78 (1938)).

Inc. v. Argyle Indus., Inc., 807 A.2d 125, 135 (Md.Ct.Spec.App. 2002) (quoting Metro. Life Ins. Co. v. Promenade Towers Mut. Housing Corp., 581 A.2d 846, 852 (Md.Ct.Spec.App. 1990)). Rather, a valid contract modification requires mutual assent, L & L Corp. v. Ammendale Normal Inst., 236 A.2d 734, 737 (Md. 1968) (citing Vincent v. Palmer, 19 A.2d 183, 188 (Md. 1941)), and consideration, see Richard F. Kline, Inc. v. Shook Excavating & Hauling, Inc., 885 A.2d 381, 392 (Md.Ct.Spec.App. 2005).

Mutual assent comprises two elements: "(1) intent to be bound, and (2) definiteness of terms." Cochran v. Norkunas, 919 A.2d 700, 708 (Md. 2007). "Failure of parties to agree on an essential term of a contract may indicate that the mutual assent required to make a contract is lacking." Id. To satisfy the second element of mutual assent, the Estoppel Certificate, "must express with definiteness and certainty the nature and extent of the parties' obligations." Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc., 941 A.2d 1181, 1209-10 (Md.Ct.Spec.App. 2008) (citing Canaras v. Lift Truck Servs., 322 A.2d 866, 871 (Md. 1974)).

Here, only Experient signed the Estoppel Certificate. This is significant for two reasons. First, the Lease Agreement contains an integration provision, which provides that "no subsequent . . . amendment . . . to this Lease shall be binding

17

upon Landlord or Tenant unless reduced to writing signed by them." (Lease Agreement at 18) (emphasis added). This provision does not permit the parties to amend the Lease Agreement with a writing signed by only one of them. Second, to the extent Experient's representations in the Estoppel Certificate could be considered "terms," by not signing the Estoppel Certificate, it is unclear whether Expo Properties agreed to any of the terms in the Estoppel Certificate, let alone the essential terms. As such, the Court concludes there was no intent to be bound.

Turning to definiteness, on five separate occasions, Expo Properties and Experient executed written amendments to the Lease Agreement that they labeled as "Amendments." The terms of the First through Fifth Amendments are definite—the parties specified the new obligations under the Lease Agreement and clarified that any provisions of the Lease Agreement not addressed in the Amendments remained in full force and effect.

Unlike the terms of the First through Fifth Amendments, the terms of the Estoppel Certificate are far from definite. First, the Estoppel Certificate is not labeled an amendment. Second, the Estoppel Certificate does not describe which, if any, contractual obligations in the Lease Agreement are changing. For instance, paragraph 8 of the Estoppel Certificate only recites a portion of the first sentence of Article 8 of the

18

Lease Agreement.  The Estoppel Certificate, however, does not state whether the rest of the language in Article 8, namely the Article 8 Cost-Sharing Provision, is being deleted.  Paragraph 8 of the Estoppel Certificate also makes a vague reference to Article 6 of the Lease Agreement, stating that tenant acknowledges that it is responsible for all repairs, but it does not address whether the Article 6 Cost-Sharing Provision or other portions of Article 6 are being deleted.  Third, assuming, without finding, that the Estoppel Certificate amended the Lease Agreement, the Estoppel Certificate does not provide whether the sections of the Lease Agreement not addressed in the Estoppel Certificate remained in full force and effect.

The Court, therefore, concludes that there was no mutual assent associated with the Estoppel Certificate because there was no intent to be bound or definiteness of terms.

Consideration is defined as "a benefit to the promisor or a detriment to the promisee."  Cty. Comm'rs for Carroll Cty., 941 A.2d at 1213-14 (quoting Harford Cty. v. Town of Bel Air, 704 A.2d 421, 430 (Md. 1998)).  "Consideration necessitates that 'a performance or a return promise must be bargained for.'" Chernick v. Chernick, 610 A.2d 770, 774 (Md. 1992) (quoting Restatement (Second) of Contracts § 71 (Am. Law Inst. 1981)).  A performance or return promise "is bargained for if 'it is sought by the promisor in exchange for his promise and is given by the

promisee in exchange for that promise.'" Id. (quoting Restatement (Second) of Contracts § 71). Additionally, there is no consideration when a party performs or promises to perform a pre-existing legal obligation. See Berger v. Burkoff, 92 A.2d 376, 379 (Md. 1952).

In the Estoppel Certificate, Experient attests to the veracity of numerous facts regarding the Lease Agreement, including its existence, its terms, and Experient's compliance with its terms. The Estoppel Certification uses "warrants," "certifies," and "acknowledges" in conjunction with Experient's representations. (Def.'s Mot. for Partial Summ. J. Ex. 5 ["Estoppel Certificate"], ECF No. 54-6). Experient makes no promises. Nevertheless, to the extent Experient's representations could be construed as promises to perform Experient's obligations under the Lease Agreement, Experient was legally obligated by contract to perform those obligations. Furthermore, assuming, without finding, that the Estoppel Certificate eliminated the Articles 6 and 8 Cost-Sharing Provisions, the Estoppel Certificate is silent as to what Expo Properties agreed to do in exchange.

Expo Properties contends that there was consideration for the Estoppel Certificate because Mercantile benefited by proceeding with the loan and Merchants Properties benefited by consummating its acquisition of the Leased Premises. To be

sure, a benefit to a party outside a contractual relationship can be sufficient consideration for an agreement or promise. Queen City Enters., Inc. v. Indep. Theatres, Inc., 187 A.2d 459, 461 (Md. 1963). Nonetheless, as stated above, the consideration must be bargained-for. Chernick, 610 A.2d at 774 (quoting Restatement (Second) of Contracts § 71). Here, even assuming that Experient's representations in the Estoppel Certificate are promises of performance, Experient did not seek Mercantile's promise to finalize the loan in exchange for Experient's promises. Rather, Experient executed the Estoppel Certificate because it was contractually obligated to do so—Article 26 of the Lease Agreement provides that Experient must execute an estoppel certificate at Expo Properties's request. For these reasons, the Court finds that the Estoppel Certificate lacked consideration.

Finally, Expo Properties argues that the Estoppel Certificate amended the Lease Agreement because the Fifth Amendment expressly incorporates the Estoppel Certificate into the Lease Agreement. The first paragraph of the Fifth Amendment states that Experient and Expo Properties "have agreed that the LEASE AGREEMENT executed between them on March 17, 1994; its Four subsequent Amendments . . . and the Estoppel Certificate dated July 18, 2006 (hereafter collectively referred to as "the existing Lease") is hereby amended as follows." (Fifth

Amendment at 1).  This paragraph, however, is not an operative part of the agreement because it is within the recitals.  See Pulaski v. Riland, 86 A.2d 907, 910 (Md. 1952) (stating that recitals fall outside the operative portion of an agreement).  "To determine what the parties did, we look not to the recitals, but to the operative part of the Agreement itself."  Baker v. Baker, 109 A.3d 167, 175 (Md.Ct.Spec.App. 2015).  The operative part of the Fifth Amendment does not address the Estoppel Certificate.  What is more, the Fifth Amendment does not cure the lack of consideration and mutual assent for the Estoppel Certificate.

In sum, the Court concludes there was no mutual consent or consideration for the Estoppel Certificate and the recitals to the Fifth Amendment did not cure these fatal defects.  Accordingly, the Court concludes that the Estoppel Certificate did not amend the Lease Agreement, and the Court will deny Expo Properties's Motion and grant Experient's Motion with respect to this issue.[7]

### b.  Responsibility for Repair Costs

Expo Properties next argues that the Lease Agreement requires Experient to pay the entire cost of all repairs.

---

[7] To the extent Expo Properties also argues that the May 1998 Letter amended the Lease Agreement, this argument fails because like the Estoppel Certificate, the May 1998 Letter lacks mutual assent and consideration.

Addressing this issue, as well as those raised in Experient's Motion, requires the Court to interpret the Lease Agreement. Under Maryland law,[8] contract interpretation, including the determination of whether a contract is ambiguous, is a question of law. Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC, 829 A.2d 540, 544 (Md. 2003). "The cardinal rule of contract interpretation is to give effect to the parties' intentions." Bank of Commerce v. Md. Fin. Bank, No. ELH-14-610, 2015 WL 925963, at *7 (D.Md. Mar. 2, 2015) (quoting Dumbarton Imp. Ass'n. Inc. v. Druid Ridge Cemetery Co., 73 A.3d 224, 232 (Md. 2013)), aff'd, No. 15-1328, 2016 WL 611509 (4th Cir. Feb. 16, 2016). To determine the parties' intentions, the Court begins with the written language of the contract. Id.

Maryland applies the law of objective contract interpretation under which the Court "must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was

---

[8] Because the Court has diversity jurisdiction over this case, the Court must apply Maryland's choice of law rules. See Harvard v. Perdue Farms, Inc., 403 F.Supp.2d 462, 466 (D.Md. 2005) (citing Limbach Co., LLC v. Zurich Am. Ins. Co., 396 F.3d 358, 361 (4th Cir. 2005)). Maryland courts generally enforce choice of law provisions in contracts. Cunningham v. Feinberg, 107 A.3d 1194, 1204 (Md. 2015) (citing Am. Motorists Ins. Co. v. ARTRA Grp., Inc., 659 A.2d 1295, 1301 (Md. 1995)). Here, the Lease Agreement provides that it "shall be construed under the laws of the State of Maryland." (Lease Agreement at 18). Accordingly, the Court will apply Maryland's rules of contract interpretation.

effectuated." Gen. Motors Acceptance Corp. v. Daniels, 492 A.2d 1306, 1310 (Md. 1985). If "the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed." Id. In this situation, "[t]he true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." Id. Plain and unambiguous language "will not give away to what the parties thought that the agreement meant or intended it to mean." Id. (citing Board of Trustees v. Sherman, 373 A.2d 626, 629 (Md. 1977)).

The construction of an unambiguous contract is for the Court alone to determine. Wells v. Chevy Chase Bank, F.S.B., 768 A.2d 620, 630 (Md. 2001) (quoting Rothman v. Silver, 226 A.2d 308, 310 (Md. 1967)). Thus, if the Court determines that a contract is unambiguous on a dispositive issue, "it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue." Cochran, 919 A.2d at 709 n.8 (quoting Wash. Metro. Area Transit Auth. v. Potomac Inv. Props., Inc., 476 F.3d 231, 235 (4th Cir. 2007)).

A written contract is not ambiguous "simply because, in litigation, the parties offer different meanings to the language." Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank,

24

N.A., 929 A.2d 932, 952 (Md. 2007).  Rather, under Maryland's objective view of contracts, "a written contract is ambiguous if, when read by a reasonably prudent person, it is susceptible of more than one meaning."  Calomiris v. Woods, 727 A.2d 358, 363 (Md. 1999) (citing Heat & Power Corp. v. Air Prods. & Chems., Inc., 578 A.2d 1202, 1208 (Md. 1990)).  When determining whether a contract is ambiguous, the Court will consider "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution."  Id. (quoting Pac. Indem. Co. v. Interstate Fire & Cas. Co., 488 A.2d 486, 488 (Md. 1985)).

The Court may consult extrinsic evidence to aid its interpretation of a contract only when the contract is ambiguous.  Sy-Lene of Wash., Inc., 829 A.2d at 544 (citing Calomiris, 727 A.2d at 363).  Because Maryland applies the law of objective contract interpretation, "extrinsic evidence should answer the question: how would a reasonable person have understood the [contract] language at the time it was made?"  Dumbarton Imp. Ass'n, Inc., 73 A.3d at 237.  If "resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must . . . be refused and interpretation left to the trier of fact."  Cochran, 919 A.2d at

709 n.8 (quoting <u>Wash. Metro. Area Transit Auth.</u>, 476 F.3d at 235).

The Court construes a written agreement in its entirety and gives effect to each clause so that the Court "will not find an interpretation which casts out or disregards a meaningful part of the language of the writing." <u>Sagner v. Glenangus Farms, Inc.</u>, 198 A.2d 277, 283 (Md. 1964). The Court gives words "their ordinary and usual meaning, in light of the context within which they are employed." <u>DIRECTV, Inc. v. Mattingly</u>, 829 A.2d 626, 632–33 (Md. 2003) (citing <u>Kasten Constr. Co. v. Rod Enters., Inc.</u>, 301 A.2d 12, 18 (Md. 1973)). It is inappropriate for the Court to "add or delete words to achieve a meaning not otherwise evident from a fair reading of the language used." <u>Brensdel v. Winchester Constr. Co.</u>, 898 A.2d 472, 485 (Md. 2006). Indeed, the Court must not "rewrite the terms of a contract so as to avoid hardship to a party, or because one party has become dissatisfied with its terms." <u>Phoenix Servs. Ltd. P'ship v. Johns Hopkins Hosp.</u>, 892 A.2d 1185, 1224 (Md.Ct.Spec.App. 2006).

Expo Properties contends that the parties always intended the Lease Agreement to be a "net lease," under which Experient would pay all costs of operating, repairing, and maintaining the Leased Premises. Expo Properties concedes that the Article 8 Cost-Sharing Provision is inconsistent with such an arrangement,

but argues that provision creates ambiguity that the Estoppel Certificate and the Lease Agreement's twenty-year course of performance resolve.[9] Expo Properties relies almost exclusively on the parties' course of performance, highlighting extensive deposition testimony and accounting records demonstrating that Experient always paid the entire cost of all repairs.

Experient argues that the Lease Agreement unambiguously provides that Experient is not required to pay the entire cost of all repairs because the Articles 6 and 8 Cost-Sharing Provisions make Expo Properties responsible for paying half the cost of repairs that meet the criteria of those provisions. Experient also repudiates the evidence of course of performance, arguing it is completely inapposite because the Lease Agreement is unambiguous.

The Court observes several portions of the Lease Agreement that appear to make Experient responsible for paying the entire cost of all repairs. For instance, Article 4D(2) provides that Experient "agrees to pay the costs and expenses paid or incurred by or on behalf of Landlord for managing, operating, maintaining and repairing the Leased Premises," (Lease Agreement at 4), and Article 6C provides that "Landlord shall be under no liability

---

[9] The Court has previously concluded that the Estoppel Certificate did not amend the Lease Agreement to eliminate the Articles 6 and 8 Cost-Sharing Provisions. As such, this portion of Expo Properties' argument fails.

for repairs[s]," (id. at 8). The Articles 6 and 8 Cost-Sharing Provisions are clearly at odds with this language. The question becomes, then, whether the Articles 6 and 8 Cost-Sharing Provisions create ambiguity or whether they are unambiguous exceptions to Experient's exclusive financial responsibility for all repairs.

Article 6C begins by stating, "Tenant shall keep at its own expense (except as otherwise provided hereinbelow) the exterior and interior of the Leased Premises . . . in the same good order in which they are received." (Id.) (emphasis added). The exception that follows is the Article 6 Cost-Sharing Provision. Article 8 begins by explaining that "Tenant shall be responsible to make all necessary repairs," (id. at 11) (emphasis added). Notably, this portion of the first sentence of Article 8 does not say that Experient shall "pay for" or "bear the cost of" all repairs—it says "make," as in "carry out," all repairs. Webster's Third New International Dictionary Unabridged at 1363 (Philip Babcock Gove, ed., Merriam-Webster 1986) (defining "to make" as "to carry out"); see Sy-Lene of Wash., Inc., 829 A.2d at 547 (Md. 2003) (consulting dictionary to determine the usual and ordinary meaning of a term). It is the Article 8 Cost-Sharing Provision that specifies who is actually responsible for paying for any repairs that are made because it explicitly addresses who bears the cost:

> The <u>cost</u> of all structural repairs and
> maintenance to the Leased Premises . . .
> <u>shall be borne</u> by the Tenant as additional
> rent hereunder, <u>except</u> in those instances
> where [Tenant's negligence did not cause the
> repair, the repair costs $5,000 or more, and
> the actual economic life of the repair
> exceeds the term of the Lease Agreement then
> in effect, in which case Landlord and Tenant
> each pay half the cost].

(<u>Id.</u> at 11-12) (emphasis added).  Like the Article 6 Cost-Sharing Provision, the Article 8 Cost-Sharing Provision uses the word "except," plainly evincing that the parties also intended the Article 8 Cost-Sharing Provision to be an exception to Experient's exclusive financial responsibility for all repairs.

The Court, therefore, concludes that the Lease Agreement is unambiguous and does not require Experient to pay the entire cost of all repairs.  Rather, according to the Articles 6 and 8 Cost-Sharing Provisions, Experient is only responsible for fifty percent of the cost of repairs when they meet the specified criteria.  Because the Lease Agreement is unambiguous, the Court cannot rely on the extensive extrinsic evidence that Expo Properties presents.  <u>See</u> <u>Calomiris</u>, 727 A.2d at 363.  Even if Experient paid the entire cost of all repairs during the two decades the Lease Agreement was in effect, the plain, unambiguous language of the Lease Agreement limits Experient's financial responsibility.  The Articles 6 and 8 Cost-Sharing Provisions utterly belie any purported intention to make

Experient responsible for the entire cost of all repairs.  And,
disregarding the Articles 6 and 8 Cost-Sharing Provisions would
be tantamount to rewriting the terms of the Lease Agreement,
which the Court must not do.  See Phoenix Servs. Ltd. P'ship,
892 A.2d at 1224.  Accordingly, the Court will deny Expo
Properties' Motion as to this issue.

c.  **Condition of Leased Premises upon Surrender**

Expo Properties further asserts that the Lease Agreement
requires Experient to return the Leased Premises in the same
good order and original condition it received them at the
beginning of the lease term.  The Lease Agreement contains two
provisions that address the condition in which Experient must
return the Leased Premises.[10]  First, Article 6C provides that
Experient shall surrender the "exterior and interior of the
Leased Premises, together with all windows and glass,
electrical, plumbing, heating, air conditioning and other
mechanical equipment used in connection therewith . . . in the
same good order in which they are received."  (Lease Agreement
at 8).  Second, Article 24 similarly provides that Experient

---

[10]  Expo Properties relies on Article 6L to support its
argument that the Lease Agreement requires Experient to return
the Leased Premises in the same condition it received them.  The
Court observes, however, that Article 6L only addresses those
portions of the Leased Premises from which Experient removes
alterations such as repairs, replacements, decorations, or
fixtures.  The Court concludes, therefore, that Article 6L is
not helpful in resolving this request for declaratory relief.

shall "return the Leased Premises and all equipment and fixtures of Landlord therein to Landlord in as good condition as when Tenant originally took possession." (Id. at 22). Unlike Article 6C, however, Article 24 excepts "ordinary wear." (Id.). Consequently, Articles 6C and 24 are in conflict—both provisions require Experient to return the Leased Premises in the same condition in which it received them, but Article 24 permits Experient to leave ordinary wear.

When a written agreement contains conflicting provisions, if "one is general in character and the other is specific, the specific stipulation will take precedence over the general, and control it." Heist v. E. Sav. Bank, FSB, 884 A.2d 1224, 1228 (Md.Ct.Spec.App. 2005) (quoting Fed. Ins. Co. v. Allstate Ins. Co., 341 A.2d 399, 407 (Md. 1975)). Also, conflicting provisions "must, if possible, be construed to effectuate the intention of the parties as collected from the whole instrument, the subject matter of the agreement, the circumstances surrounding its execution, and its purpose and design." Heist v. E. Sav. Bank, FSB, 884 A.2d 1224, 1228 (Md.Ct.Spec.App. 2005) (quoting Chew v. DeVries, 213 A.2d 742, 745 (Md. 1965)).

Here, the relevant language in Article 6C is general in character—it disregards the exception for ordinary wear. Conversely, the pertinent language in Article 24 is more specific because it identifies the exception for ordinary wear.

31

As such, the Court concludes that Article 24 controls. Moreover, interpreting the Lease Agreement to find that the Lease Agreement does not require Experient to remedy ordinary wear is consonant with the intention of the parties as reflected outside the relevant language in Articles 6C and 24. A separate portion of Article 6C addresses carpeting and provides that Experient shall pay for "any damage to carpeting caused by lack of protective mats under desk chairs or equipment or <u>any other abnormal</u> puncture of <u>wearing</u> of carpeting." (<u>Id.</u> at 8) (emphasis added). If the parties did not intend to create an exception for ordinary, or normal, wear, there would have been no reason to define "abnormal" wear because Experient would be required to rectify any and all wear during the lease term.

The Court, thus, concludes that the Lease Agreement requires Experient to return the Leased Premises in the same good order and original condition in which Experient received them, <u>except for ordinary wear</u>. Accordingly, the Court will deny Experient's Motion as to this issue.

**2. Experient's Motion**

**a. Floor-to-Ceiling Walls**

Experient first argues that the Lease Agreement does not require it to remove floor-to-ceiling walls because they are improvements, not fixtures. Expo Properties maintains that floor-to-ceiling walls are fixtures.

Article 6L of the Lease Agreement addresses alterations to the Leased Premises.  It provides that "Tenant will make and/or affix all interior repairs, replacements, fixtures, and decorations at its own cost."  (Id. at 10).  It then states that to the extent any of these alterations "shall become affixed to the Leased Premises or shall be attached to the face of any wall or partition (interior or exterior) in the Leased Premises," these alterations "shall become the property of the Landlord." (Id. 10–11).  Article 6L also gives Expo Properties an option at the end of the lease term to require the tenant to remove all alterations and restore the portions of the Leased Premises affected by the removal to their original condition.  (Id. at 11).  Finally, the Lease Agreement provides that Experient must obtain prior written consent before making "improvements" to the Leased Premises.  The Lease Agreement does not require Experient to remove improvements at the end of the lease term.

Because floor-to-ceiling walls do not constitute repairs, replacements, or decorations based on the ordinary meaning of these terms, the Court must determine whether floor-to-ceiling walls are fixtures.  Article 6L contemplates that fixtures could be "affixed" to the Leased Premises or "attached to the face of [a] wall or partition."  (Id. at 10).  To affix is defined as "to attach physically (as by nails or glue)."  Webster's Third New International Dictionary Unabridged at 36.  Because an

33

entire floor-to-ceiling wall could reasonably be attached to another wall with nails or another fastener, a reasonable person could interpret a floor-to-ceiling wall as a fixture. But, a reasonable person might also construe a fixture as defining something much smaller than a floor-to-ceiling wall that would not cover the entire surface of another wall to which it was attached. Thus, because the term fixture is reasonably susceptible of alternate meanings—one that includes floor-to-ceiling walls and one that does not—the Court finds that Article 6L is ambiguous and will consider extrinsic evidence to attempt to resolve this ambiguity.

Experient presents excerpts from Laughlin's, Halpert's, and Alspaw's depositions in which they testify that a floor-to-ceiling wall is an improvement, not a fixture. (Laughlin Dep. 180:2-181:14, June 22, 2015, ECF No. 54-17); (Halpert Dep. 136:21-137:2, June 9, 2015, ECF No. 54-7); (Alspaw Dep. 176:18-21, May 12, 2015, ECF No. 65-1). This testimony, however, is of no consequence. The subjective opinions of three representatives of the parties to the Lease Agreement do little to explain how a reasonable person would have understood the term "fixture" at the time it was added to the original Lease Agreement. See Dumbarton Imp. Ass'n, Inc., 73 A.3d at 237 (explaining that extrinsic evidence did not resolve ambiguity because "the subjective aspirations of one of the parties" to a

contract "does little to explain how a reasonable person would have understood the [contract's] language at the time it was written"). Consequently, Experient's extrinsic evidence does not resolve the ambiguity concerning what constitutes a fixture.

Even assuming the record was undisputed that the parties did not intend fixtures to include floor-to-ceiling walls, Article 24 requires Experient to return the Leased Premises in the same good order and condition in which Experient received them, except for ordinary wear. If Experient installed all the floor-to-ceiling walls during its tenancy, then Article 24 would require Experient to remove these walls. In the opening brief supporting their Motion, Experient asserts that the floor-to-ceiling walls "may" have been installed during Experient's tenancy. (Mem. Of Law in Support of Mot. for Partial Summ. J., at 15, ECF No. 54-1). Experient, however, does not highlight any evidence demonstrating that any or all of the floor-to-ceiling walls that Expo Properties wants removed existed when Experient began its tenancy.

Accordingly, the Court concludes that Experient is not entitled to judgment as a matter of law and will deny without prejudice Experient's Motion as to this issue.

### b.   HVAC

Experient next asserts that the Lease Agreement does not require it to replace HVAC components simply due to their old

age.    KCI's  Initial  Report  identified  two  HVAC  replacement

activities that Experient did not agree to perform: (1) replace

any HVAC units that were installed when the Galaxy building was

first  constructed;  and  (2)  replace  original  thermostats  with

programmable  thermostats.[11]   By  directing  Experient  to  perform

these  replacements,  Expo  Properties  is  essentially  asking  for

upgrades  to  the  HVAC  systems.    The  Lease  Agreement  does  not

require this.

     As  the  Court  concluded  above,  the  Lease  Agreement  requires

Experient to pay for the repairs, replacements, maintenance, and

alterations  that  are  necessary  and  return  the  Leased  Premises  to

the  same  good  order  and  condition  in  which  Experient  received

them,  except  for  ordinary  wear.    The  Lease  Agreement  does  not

require Experient to install new HVAC equipment at the end of

the  lease  term.    Accordingly,  the  Court  will  grant  Experient's

Motion as to this issue.

### c.  Carpeting

     Experient  further  argues  that  the  Lease  Agreement  does  not

require  Experient  to  replace  all  the  carpeting  in  the  entire

Leased  Premises.    As  an  initial  matter,  it  is  unclear  to  the

Court  whether  Expo  Properties  has  actually  requested  that

---

[11] Though it is unclear in KCI's Initial Report, the Court
will assume for purposes of its analysis that when KCI's Initial
Report  states  that  HVAC  units  and  thermostats  should  be
"replaced,"  KCI  means  that  Experient  should  install  new
equipment.

Experient replace <u>all</u> the carpeting in the <u>entire</u> Leased Premises. The Hoffberger Email contains Expo Properties's two requests regarding carpeting. The first provides that "[a]ll carpeting that is damaged or worn . . . should be removed and replaced with similar carpeting." (Def.'s Mot. for Partial Summ. J. Ex. 10, at 2, ECF No. 54-11). The second provides that Experient should "patch the floors" where carpet was removed to install the half-walls. (<u>Id.</u>).

Because Article 24 excepts ordinary wear, the Court finds that the Lease Agreement does not require Experient to replace worn carpet as long as the wear is ordinary and not "abnormal." Though the Lease Agreement does not define abnormal wear, it does offer wear caused by "lack of protective mats under desk chairs or equipment" as one example of abnormal wear. (Lease Agreement at 8). As for replacing the strips of carpeting that were removed to install the half-walls, the Court finds that the Lease Agreement is ambiguous as to whether the removal of these strips qualifies as abnormal puncturing under the Lease Agreement. To puncture is defined as "to pierce with a pointed instrument or object." <u>Webster's Third New International Dictionary Unabridged</u> at 1843. It is reasonable to interpret an abnormal puncture as an unintentional rip or tear in carpeting caused by a sharp object or as an intentional extraction of a strip of carpeting with a sharp tool such as a knife.

37

Experient, however, presents no evidence from which the Court could ascertain what a reasonable person would have understood abnormal puncturing to mean when executing the original Lease Agreement and its amendments.

In sum, the Court concludes that the Lease Agreement does not require Experient to replace carpeting exhibiting only ordinary wear.  The Court also concludes that Experient is not entitled to a declaration that the Lease Agreement does not require it to replace the strips of carpeting that were removed to install the half-walls.  Accordingly, the Court will grant in part and deny without prejudice in part Experient's Motion as to carpeting.

### d.   Roof and Other Structural Repairs

Finally, Experient contends that Article 8 of the Lease Agreement does not require it to pay for any structural repairs to the Leased Premises, such as roof repairs, that Expo Properties did not make and charge to Experient as "additional rent" during the lease term.  Experient maintains that it made all necessary repairs to the roof and other structural elements of the Leased Premises before vacating.  Expo Properties disagrees, asserting that KCI's Initial and Re-Inspection Reports detail numerous structural repairs that are necessary and remain Experient's financial responsibility.

The first sentence of Article 8 provides that "Tenant shall be responsible to make all <u>necessary</u> repairs during the term of this Lease to the roof of the building of which the Leased Premises are a part and all <u>necessary</u> structural repairs to the exterior walls, foundations, sidewalks, parking lots, and driveways."  (Lease Agreement at 11) (emphasis added).  When read in isolation, this language does not specify whether the tenant or landlord determines which structural repairs are necessary—it does not say "all repairs that Landlord deems necessary" or "all repairs that Tenant deems necessary." Article 8, however, goes on to clarify this.  The second sentence of Article 8 gives Expo Properties the option to enter the Leased Premises and "make such reasonable structural repairs and maintenance to the Leased Premises <u>as Landlord may deem necessary</u> or proper."  (<u>Id.</u>) (emphasis added).  The phrase "as Landlord may deem necessary" is noticeably absent from the first sentence of Article 8.  This means that Expo Properties may only determine which repairs are necessary when it exercises its option to enter the Leased Premises, identify necessary repairs, and make those repairs on its own.  In all other instances, Experient determines which repairs are necessary.

Reading the Lease Agreement as a whole bolsters this interpretation.  The Lease Agreement makes Experient exclusively responsible for maintaining and repairing the Leased Premises,

except when repairs meet the criteria outlined in the Articles 6 and 8 Cost-Sharing Provisions. Assigning this responsibility almost entirely to Experient demonstrates that Expo Properties did not intend to take an active role, if any, in maintaining the Leased Premises. Construing Article 8 to conclude that Expo Properties is responsible for constantly monitoring and inspecting the Leased Premises to identify the structural repairs and maintenance that are necessary would be utterly antithetical to the hands-off approach that Expo Properties intended. Because Expo Properties did not exercise its option to make the structural repairs in KCI's Initial and Re-Inspection Reports that Expo Properties considers necessary, Expo Properties may not require Experient to make those repairs.

Even if Expo Properties were to make on its own the structural repairs it considers necessary, however, Experient would not be financially responsible for them. Under Article 8, regardless of who performs structural repairs, the cost "shall be borne by the Tenant as additional rent hereunder." (Id.). Article 4D provides that "additional rent" shall only be paid "[t]hroughout the term of [the] Lease." (Id. at 4). Because the Lease Agreement has expired, Expo Properties can no longer pass the cost of structural repairs onto Experient.

Accordingly, the Court will grant Experient's Motion as to this issue.

### III.  **CONCLUSION**

For the foregoing reasons, Experient's Motion for Partial Summary Judgment (ECF No. 54) will be GRANTED IN PART and DENIED WITHOUT PREJUDICE IN PART and Expo Properties' Motion for Partial Summary Judgment (ECF No. 62) will be DENIED.  The Court concludes that the Estoppel Certificate did not amend the Lease Agreement.  The Court also concludes that the Lease Agreement does not require Experient to: (1) pay the entire cost of all repairs, as the Articles 6 and 8 Cost-Sharing Provision remain operative; (2) install new HVAC equipment at the end of the lease term; (3) replace carpeting exhibiting only ordinary wear; or (4) pay for any structural repairs to the Leased Premises that Expo Properties did not make and charge to Experient as "additional rent" during the lease term.  Finally, the Court further concludes that the Lease Agreement requires Experient to return the Leased Premises in the same good order and original condition Experient received them, except for ordinary wear.  A separate Order follows.

Entered this 26th day of July, 2016

                              /s/
                    _____
                    George L. Russell, III
                    United States District Judge